IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

COURTLAND C. PITTS,           )
                                   )   C.A. No. 05-0185-JJF
                Plaintiff, )
                                   )
  -vs-                       )
                                   )
CPL. GREGORY SPENCE,       )
                                   )
                Defendant. )

Deposition of COURTLAND PITTS taken pursuant to notice at the law offices of Real World Law Firm, 916 No. 2 N. Union Street, Wilmington, Delaware, beginning at 11:30 a.m. on August 16, 2007, before Julianne LaBadia, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GLENN A. BROWN, ESQ.
        REAL WORLD LAW FIRM
          916 No. 2 N. Union Street
          Wilmington, Delaware  19805
          For the Plaintiff

        RALPH K. DURSTEIN, III, ESQ.
        ATTORNEY GENERAL'S OFFICE
          820 N. French Street - 6th Floor
          Wilmington, Delaware  19801
          For the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Courtland Fitts

7

1    Q.    How long did you work for Sojourner's Place?

2    A.    Probably two years.

3    Q.    And was that immediately before your

4    disability, or was that --

5    A.    That's the reason why I'm not working there now

6    because of my disability.  I wasn't able to go back to

7    work.

8    Q.    What I am looking at now is your criminal

9    record.

10    A.    Uh-huh.

11    Q.    And I am going back earlier, prior to the

12    incident at the body shop.  Let's see.  There's no real

13    easy way to do this.  But let me try to work backwards.

14    It looks like this is 2002, you had some motor vehicle

15    charges.  And if I read this record, the only thing that

16    you would have been found guilty of, or pled guilty to,

17    it looks like a failure to reinstate your license.  Do

18    you recall that?

19    A.    Yes, I do, but I can't tell you what year it

20    was.

21    Q.    Okay.  It says 2002 for the disposition, so if

22    you recall it at some point, that answers that question.

23    Here is my difficulty, and maybe you can help me.  There

24    is a case back in 2001, February 7th, 2001, that's a

Courtland Pitts

8

1    violation of probation, Kent County Superior Court.    It

2    looks like you were found, it says contempt.    The problem

3    is, it's impossible for me to figure out what you might

4    have been on probation for.    It could be anything from a

5    traffic ticket to a felony.    First of all, do you

6    remember being in court back in 2001 for a probation

7    violation?

8        A.    2001?

9        Q.    Yeah.    It apparently would have been Kent

10   County Superior Court, so probably in Dover.

11       A.    No.  I don't remember that.

12       Q.    Okay.

13       A.    I was on parole, but 2001 -- I been in

14   Wilmington since 2000, so I don't know why it would have

15   been in Dover.

16       Q.    Okay.  Now, I think these are offense dates,

17   May 22, 1999, it looks like you were arrested on a number

18   of charges, including an assault, second degree.  But it

19   looks to me from this record like all those charges were

20   dropped.  Is that what you recall?

21       A.    In what year was that?

22       Q.    It looks like May 22, 1999, was --

23       A.    Yes.  I was arrested in '99.

24       Q.    And those charges were all dropped by the

**W&F**

Courtland Pitts

9

1    State?

2        A.    Yes.

3        Q.    And you did not plead guilty to anything as a

4    result of that incident; is that right?

5        A.    No.

6        Q.    That's what it looks like.  And again, I

7    apologize, I am working backwards, but in some ways that

8    makes sense.

9        A.    That's all right.

10        Q.    And Mr. Brown will tell you that at a certain

11    point we're beyond a period where these charges are

12    probably going to have any significance for this case.

13    August 2, 1998, there is a Dover Police arrest for

14    shoplifting and criminal impersonation.  And it looks

15    like you either pled guilty or were found guilty?

16        A.    Yes.  I pled guilty.

17        Q.    Were those misdemeanor charges?

18        A.    Yes.

19        Q.    Did that result in any kind of incarceration?

20        A.    In what year?  '98?

21        Q.    '98.

22        A.    I'm not sure.  Something tells me I was

23    violated, but I'm not sure.  I can't recollect.

24        Q.    When you were on parole, what was that parole

Courtland Pitts

10

1    for?

2        A.    Oh.    The charges that I had was found guilty of

3    theft charges in 1982.

4        Q.    Okay.    There is a charge, February 18th, 1998,

5    patronizing a prostitute.    There were some other charges,

6    but it looks like you were found guilty at trial of that

7    charge.    Do you recall that?

8        A.    Yes.

9            MR. BROWN:    Is that a misdemeanor or a

10   felony?

11           MR. DURSTEIN:    I think a misdemeanor.

12       Q.    Is that what you recall, Mr. Pitts?

13       A.    Yes.

14       Q.    And it looks like there was a stalking charge

15   related to that, and you were found not guilty of that

16   charge?

17       A.    Right.

18       Q.    And then, I'm not going to ask you about them

19   in detail, but it looks like you might have had a number

20   of charges in 1982 that were felonies, that were resolved

21   by some kind of guilty plea or plea bargain?

22       A.    No.

23       Q.    Or was that trial?

24       A.    It was trial.



Courtland Pitts

11

1       Q.    Okay.  And would I be correct, they were felony

2  thefts, burglary, and --

3       A.    No.  I was found guilty of theft charges.

4       Q.    Okay.  And what was your sentence for that?

5       A.    25 years.

6       Q.    How much of that did you serve?

7       A.    14.

8       Q.    So you were paroled roughly in 1996?

9       A.    Right.

10       Q.    And has that parole expired?

11       A.    Yes.  They just took me off parole probably --

12  sometime this year.  I don't know.  Early this year.  I

13  don't remember when.

14       Q.    In 2007?

15       A.    Yes.  Excuse me.  Let me correct that.  They

16  took me off supervision.  I don't have to report.

17       Q.    Do you have any contact now with the parole

18  officer, with Department of Corrections?

19       A.    No.

20       Q.    Now, I'm trying to understand, we'll get to the

21  facts, and certainly I'll allow you to tell me what you

22  recall from this incident.  But I am more now directed to

23  the Complaint, which you drafted yourself in this case.

24  And I am trying to understand, just in general, what your

Courtland Pitts

12

1   claims are against my client.

2          And actually, although it would be unusual,

3   I guess, you are represented now, you were pro se then.

4   If you want to defer to Mr. Brown on these, I'm okay with

5   that.  So, you know, feel free to say to me, you know, I

6   don't understand the question, or I would rather have my

7   lawyer respond to that.  It's up to you.

8          Let me tell you what I understand, from

9   reading what you've submitted, what you are alleging.

10  It's clear you're alleging that you were -- I'll call it

11  false arrest.  You don't think you should have been

12  arrested.  Is that fair to say?

13      A.   Correct.

14      Q.   You, I think, are trying to state a claim for

15  discrimination.  That is, you believe you were arrested

16  because you are a Black man, and you were discriminated

17  against.  Is that one of your allegations?

18      A.   Yes.

19      Q.   Okay.  And I think, to put it in a broad

20  category, you are alleging malicious prosecution, that

21  the charges should not have been continued by the

22  Department of Justice to the point of a trial; is that

23  fair?

24      A.   Correct.



Courtland Pitts

13

1      Q.   Okay.  Now, in your mind, there are kind of

2   three areas I've mentioned, and I'm not saying that's all

3   that's in the Complaint, but are there claims against

4   Corporal Spence that come to mind that I haven't

5   mentioned?  And again, if you just want to defer to your

6   attorney at this point, I'm okay with that.  But if

7   there's anything on your mind you want to tell me --

8      A.   Repeat that question again, please.

9      Q.   Sure.  Are there any kind of legal claims that

10   in your mind, you want your attorney to pursue, beyond

11   false arrest, discrimination, malicious prosecution?

12      A.   Because I haven't looked at that Complaint in a

13   while, I'll refer that to Mr. Brown, my attorney, that

14   question.

15      Q.   Fair enough.  Let me ask it this way:  Do you

16   include an allegation that the police officers used what

17   I'll call excessive force in taking you into custody?

18      A.   No.  I do not.  Excuse me.  Can I --

19      Q.   Sure.  Go ahead.

20      A.   Other than the cuffs being too tight, there

21   wasn't no unnecessary force.  They didn't beat me up or

22   nothing.

23      Q.   All right.  Did the cuffs being too tight cause

24   you any permanent injury?

Courtland Pitts

14

1      A.    No.

2      Q.    Did you seek any medical treatment for that?

3      A.    I don't recall.  I don't think I did.

4      Q.    Let me ask what you remember, because Ms. Reid,

5  of course, it's difficult for her.  She wasn't the person

6  arrested.  The record appears to show that you were

7  arrested, booked, charged, and released on bail.  Is that

8  what you recall?

9      A.    Yes, sir.

10     Q.    Were you released that same night?

11     A.    Yes.

12     Q.    Do you remember if Ms. Reid came to pick you

13  up?

14     A.    Yeah.  I remember.

15     Q.    She did?

16     A.    She did not.

17     Q.    She did not?  Okay.

18     A.    She did not.

19     Q.    When you were released, were you released from

20  the police station 2?

21     A.    They made me walk from PS 2 for a ride, because

22  they gave someone else a ride.  They told me this ain't

23  no taxi.  They made me walk just about all the way back

24  to Wilmington.

Courtland Pitts

19

1       Q.    Right.

2       A.    He said, "Here is the guy that accused us of

3    stealing his radar detector out of his car."

4               I got out of my car, and I said, "Excuse

5    me.  I'm not here about that."  I said, "Where is the

6    owner at?"

7               He comes out and says, "I'm the owner.

8    What's the problem?"

9               I said, "Come here.  Can I show you

10   something?  Stuff I'm not satisfied with my car."  I

11   started walking around the car showing him stuff that I

12   wasn't satisfied with.

13              He said, "Well, I'm getting ready to leave

14   now," in a nasty tone.  "You got to come back later."

15              I said, "When?"

16              He said, "MF, don't rush me.  I ain't got

17   to do nothing."

18              I said, "Hold on.  We don't have to go

19   there.  I'll sue you, too, if I got to."

20              He said, "MF, you going to sue me?  You

21   going to sue me?"  And he shoved me.  And I hit him.

22   That's how the incident started.

23      Q.    So we're on the date of the incident now?

24      A.    Yes.

27

1    detector out of his car." And I overheard that.

2                I said, "I'm not here from that. I didn't

3    accuse either one of you. It was missing from the time I

4    brought it here to Maaco to back. I'm not concerned

5    about that. I'm here concerned about the work that

6    wasn't done that I paid for, wasn't done right."

7        Q.    And what did he say?

8        A.    And I said, "Where is the owner at?" I didn't

9    even remember the guy's name.

10                He said, "Here I am. What's the problem?"

11                I said, "Come here. Can I show you what

12   I'm not satisfied?" I start walking around the car,

13   pointing everything -- four or five things that wasn't

14   right.

15                And his tone of voice said, "I'm going to

16   get ready to leave. You got to come back later."

17                I said, "When?"

18                "MF, don't rush me. I won't do nothing."

19                I said, "Hold on, man. Whoa. We ain't got

20   to go there. I'll sue you if I got to."

21                He said, "MF, MF, you going to sue me? You

22   going to sue me?" And he shoved me, and when he shoved

23   me, excuse my language, I knocked the hell out of him.

24   And I hit him, and we got fighting.

1      Q.   And you reached that point after this incident

2  when you had the accident in May, I guess, of 2003?

3      A.   Yes.  My last accident.

4      Q.   Okay.  Back to this.  When Mr. Mitchem pushed

5  you, can you describe to me, you know, where were his

6  hands on your body?  How did he do that?

7      A.   On my chest.  He shoved me like that

8  (indicates).

9      Q.   I have to describe it for the record.

10     A.   Two hands, he shoved me like that.  "MF, MF,

11 you going to sue me?  You going to sue me?"  And shoved

12 me with two hands.  When he shoved me, he didn't knock me

13 completely off balance and I swung and hit him.

14     Q.   So you didn't fall down when he shoved you?

15     A.   No.

16     Q.   And the next thing is you are showing me you

17 swung right handed?

18     A.   Yes.

19     Q.   Where did you hit him?

20     A.   In the face, I think.  In the mouth and face.

21 I know it was in the face area.

22     Q.   Now, you have been kind enough for the court

23 reporter to use MF several times, quoting Mr. Mitchem.

24 Am I correct that he actually said the word -- the actual

Courtland Pitts

31

1    word and --

2         A.   Yes.   He actually said the word.

3         Q.   And the record will be clear about that.   All

4    right.   After you struck him in the face, what did he do

5    at that point?

6         A.   We kept fighting, probably five -- five

7    minutes.

8         Q.   Is this a physical fight?

9         A.   Physical fight.   We're hitting each other.

10        Q.   All right.   Okay.   And are these blows

11   connecting?   Do you know what I mean?

12        A.   Mine was.

13        Q.   Okay.

14        A.   And his did, too.   But not as often as I did.

15        Q.   And are you hitting him like face?   Chest,

16   or --

17        A.   Anywhere I could hit him.

18        Q.   And these are punches, right?   They're --

19        A.   Yes.

20        Q.   By you and by him, correct?

21        A.   Yes.

22        Q.   If he connected at all, where did he hit you?

23        A.   In the shoulder area.

24        Q.   Okay.   And you think this -- I mean you said

Courtland Pitts

32

1    maybe five minutes?

2        A.    Yes.   Maybe five minutes, I guess.

3        Q.    Okay.   Were you injured at any point as a

4    result of Mr. Mitchem striking you?

5        A.    I wasn't injured.   I pulled my back from doing

6    swinging, or making quick movement like that, I hurt

7    myself, but no, he didn't physically hurt me.

8        Q.    Do you know if you hurt him at all?

9        A.    I don't know.   I knocked him down, and that's

10   when his coworker Wykpisz grabbed the baseball bat and

11   come hollering, "Get out here you MF."   And started

12   chasing me through the industrial park.

13       Q.    Mr. Mitchem, when you knocked him down, was he

14   bleeding?

15       A.    No.   I didn't see no blood.

16       Q.    But he was knocked down because you hit him

17   hard enough he fell, right?

18       A.    Yes.

19       Q.    And that's when we'll call him Daniel, I guess

20   is the guy's first name, Mr. Wykpisz, Daniel picks up a

21   baseball bat and what does he say?

22       A.    Runs out of the garage hollering, "Get out

23   here, you MF."

24       Q.    Did he hit you with the baseball bat?

Courtland Pitts

33

A.   No.  He didn't get a chance to.  Had he not

start hollering, he could have split my head wide -- I

just took off running.  Once he started hollering, and

got like from here to maybe the table from me.

Q.   Now, when you ran off, did you arm yourself or

pick up anything?

A.   It's a big industrial park.  I ran through all

the cars so he couldn't get me.  I was hurting then, but

I ran, managed enough to duck through the cars so he

couldn't get to me.  So, I think he might have chased me

maybe 100 yards.  That's when I found the board laying in

the big parking lot, and I picked the board up in defense

of myself.  When I picked the board up, he turned around

and walked back.

Q.   So he chased you all the way into the

industrial park?

A.   And would have still been chasing me had I not

found the board to defend myself.

Q.   And just so the record is clear, when I say he,

it's Daniel chasing you?

A.   Yes.

Q.   The board you picked up was what?  A two by

four?

A.   No.  It wasn't a two by four.  It was a --

34

1    probably something about this width, maybe (indicates), a

2    little -- and probably -- maybe as long as this table, or

3    this distance, probably (indicates).

4        Q.   Let me see if I can reconstruct that for the

5    record.  The width of it, you pointed to the arm of your

6    chair, which is about an inch and a half wide, maybe?

7        A.   Maybe a little bit wider, yes.  Inch and a

8    half, maybe two.

9        Q.   Okay.  And how thick was it?  Like the chair,

10   maybe --

11       A.   About the same thickness as this.

12       Q.   Which is what?  Three-quarters of an inch,

13   maybe?

14       A.   Maybe.

15       Q.   And you said as long as the table which is --

16       A.   Probably not the whole -- probably maybe as far

17   as my arms can reach.

18       Q.   Maybe five feet long?

19       A.   Probably.

20       Q.   Okay.  And your testimony when you picked up

21   that board, that's when Daniel finally stopped chasing

22   you?

23       A.   That's when he stopped chasing me and turned

24   around.

**W&F**

Courtland Pitts

36

1       Q.    Would it be fair for me to say during the five

2    minutes or so that you and he are fighting, he would have

3    been too busy to get on a cell phone or a telephone?

4       A.    Oh, I know he didn't -- let me see.  I can --

5    well, I ain't going to say for certain, but I never seen

6    him get on the phone at all.  Not him personally.

7       Q.    Okay.

8       A.    Maybe after the guy was chasing me off.

9       Q.    Once the guy started chasing you, you ran, so

10   you could not see what Mr. Mitchem was doing, correct?

11      A.    Right.  Correct.

12      Q.    Now, I think you were at the point where you

13   walked by Daniel, he doesn't hit you, you don't hit him.

14   What happens next?

15      A.    I get back to my car, I said, let me call the

16   police.  I sit in my car, and something said look at

17   your -- your windshield.  I thought my windshield was

18   messed up.  I jumped on the car and I'm like what the --

19   and my hood was messed up bad.  And the first thing come

20   to me, when I -- wait a minute.  I'm wrong.  I'm wrong.

21   The guy beat me, Danny Wykpisz, whatever his name is, he

22   beat me back.  He went back to the shop.  I walked back

23   later.  Then when he was by the shop that's when I walked

24   past him.  So I got in my car to get my cell phone.

Courtland Pitts

37

1    Something said look at your windshield.  I thought my

2    windshield was messed up but my hood was messed up.  And

3    I said what the hell.  I asked, "Did you all see who did

4    this with my car?"

5                 First thing that come to me, the guy that

6    chased me with the bat, because he couldn't catch me,

7    went back and beat my car with the bat.  That's what I

8    thought happened.

9         Q.   So there was a dent in your hood?

10        A.   Yes.  My hood was messed up bad.

11        Q.   Is that when you called the police?

12        A.   I was calling the police when I noticed this.

13        Q.   When you called the police did you dial 911?

14        A.   Yes, I did.

15        Q.   And what happened to that phone call?

16        A.   I called probably two or three times.  I said,

17   "Can you all send someone out here to the industrial park

18   behind Atfield Seafood?"  I said, "Because the guys

19   attempted to assault me and my car is messed up."

20        Q.   And what did they say?

21        A.   They kept asking me a lot of information.  I

22   said, ma'am, can you all please get here before somebody

23   get hurt.  I said because they -- one guy had a baseball

24   bat chasing me.  I said somebody will get hurt if

Courtland Pitts

41

1    each other in any way before this?

2        A.    Never seen the woman before in my life.

3        Q.    Before the police officer got there, do you

4    remember having any conversation with Ms. Reid?

5        A.    Yes.  When I got out -- like I said, when I

6    came back and got on my cell phone and was going to call

7    the police, and someone say look at your windshield, it

8    was messed up so bad, the hood, I'm thinking it's my

9    windshield cracked.  I jumped out of my car and I'm like

10    what in the world.  So I asked -- I don't know, the guys

11    next door who were standing and watching all of this, two

12    or three white guys, I said did you all see who done this

13    to my car?  And they turned their head.

14        So I was saying Ms. Reid -- I didn't know

15    her name then, and I think it was two other gentlemen

16    walking with her, and I said, did you all see who done

17    this to my car?

18        And they told me, we don't want to get

19    involved.  When they said that, I said you sorry MF.  You

20    all seen everything here happened, and talking about you

21    don't want to get involved.

22        Ms. Reid said my uncle told me don't get

23    involved.

24        I said, excuse my language.  Damn your

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Courtland Pitts

42

1    uncle.  I said you as old as I am.  If he too coward to

2    stand up and say something, that shouldn't have no effect

3    on you.  And then me and them almost had -- have some

4    words.  And then they went on about their business.  Then

5    the cops finally arrived.

6         Q.   So never did tell you who had done the damage

7    to the hood?

8         A.   No.  They told me they didn't want to get

9    involved.

10        Q.   Okay.  Now, when the first police officer

11   arrived, which I believe is Corporal Spence, I don't know

12   if you know for sure by name tag or later on, but is that

13   Gregory Spence, the first officer that arrived?

14        A.   Yes.

15        Q.   Tell me what happened from the point he arrived

16   in his patrol car.

17        A.   When he arrived, it's a big industrial park.

18   He didn't come straight around.  He went all the way

19   around, and when I seen a State trooper, I stood by the

20   car and then like this waved to him to get his attention,

21   and then like this (indicates).  So when he pulled up, he

22   seen me, pulled up probably to that -- cracked the

23   window, "Get back.  Get back.  Get back."

24              I'm like what in the world is all this for?

Courtland Pitts

43

1              So I stopped and looked at him.  He ran my

2    description in, or whatever, ran my tags in.  Talked for

3    a few minutes.

4         Q.    Talked to you or talked to --

5         A.    No.  Talked on the radio for a few minutes.

6         Q.    Okay.  Now, where is Mitchem at this point?

7         A.    Him and the other guy, they still standing by

8    the body shop and some other people standing there

9    talking to them.

10        Q.    Okay.

11        A.    They standing in front of their --

12        Q.    How far were Mitchem and Danny from the patrol

13   car?  Estimate.

14        A.    Probably -- I want to say 20 or 30 yards.

15        Q.    Okay.  And how far were you from the patrol

16   car?  At that point.

17        A.    Oh, I might have been maybe 5 or 10 feet from

18   the police cruiser.

19        Q.    Okay.  And is the police car kind of in between

20   you on the one side, and the other two guys on the other

21   side, or not?

22        A.    No.  My direction is facing this way, the --

23   it's a big shop, and it's like a U, and it's shops on all

24   sides.  I'm on the left side.  The cop came in on the

Courtland Pitts

44

1    right side, so he came all the way around.

2            The shop is like over here, my car is

3    almost in front of the shop.  Or a little bit past it.

4    The police officer probably like 20 or 30 yards further

5    back, and that's when I seen him, coming in, I got where

6    he could see me and waved to him and start walking to the

7    officer.

8        Q.    Okay.  And he said stay where you are?

9        A.    Cracked the windows.  "Get back.  Get back.

10   Stop."  I'm like what in the world is this attitude for.

11       Q.    After he is talking on the radio and so forth,

12   what happens next?

13       A.    He talked for maybe two or three minutes,

14   looked at me, for maybe a minute or two, jumped back on

15   it again, and I -- that's -- and my comment was, "If I

16   was a white guy, you would have been out of that car."

17            He jumped out of the car, "What did you

18   say?  What did you say?"

19            I said, "You heard what I said."

20            "Are you calling me a racist?"

21            I said, "You damn right, that's what I'm

22   calling you.  You asking me, am I calling you a racist,

23   you damn right that's what I say."  I say, "I called you

24   and you treat me like I'm some criminal because of these

Courtland Pitts

45

1     white guys here."

2              He told me to shut up.

3              I said, "Shut up?"  I said, "That badge you

4     wear, the respect you earn.  With me, you want me to shut

5     up, you shut me up."

6              He got in my face, almost bumped me and we

7     sit there arguing, hollering at each other for maybe 10

8     minutes.  He told me, "You don't shut the F up I'm going

9     to" --

10             I said, "That's what you want to do anyway.

11    You had no intentions of hearing my side of the story."

12    I said, "I called you all and you treat me like I'm some

13    common criminal."

14             He said, "I have to do this."

15             I said, "I understood your attitude wasn't

16    proper when you first approached me."

17             He said, "I had to call" -- something.

18             I said, "I didn't have no problem for you

19    doing your job.  That's why you disrespected me, hollered

20    at me, I calmed down and waited for a few minutes."

21             I said, "you Looked at me and had to jump

22    back on again."

23             He said, "I had to call again, because I

24    heard there was a gun involved."

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Courtland Pitts

49

1    was standing there talking to both of them.

2        Q.    All right.  And did you see Mr. Mitchell

3    arrested?

4        A.    Yes.  But it wasn't the officer arrested me.

5    The female officer arrested him.  And the only reason why

6    he was arrested, because he lied and told them that --

7    they asked him how did my car get damaged, and he lied

8    and said when Mr. Pitts knocked me down or something and

9    I was chasing him I tried to jump over his car and fell.

10   He told -- what's -- Mr. Corporal Spence that, and he

11   believed that.  The female officer didn't believe it.

12       Q.    So, the female police officer was the one

13   that --

14       A.    She the one that arrested --

15       Q.    Mitchem?

16       A.    Yes.  Other than that, nobody wouldn't have

17   been arrested but me.

18       Q.    So, Mr. Mitchem is handcuffed?

19       A.    Didn't even handcuff him.

20       Q.    Put him in the --

21       A.    Just put him in the front seat of the police

22   car.

23       Q.    The female officer's car?

24       A.    Yes.  But she did take him into custody.  I did

Courtland Pitts

50

1  see that.

2      Q.   But Danny was not arrested?

3      A.   No.

4      Q.   Okay.  Did either of the officers come back to

5  you after speaking to Mitchem, and tell you what he had

6  said, or ask you anything about it?

7      A.   Never.  Only -- never asked me my side of the

8  story, until like five hours out that police station.

9  When he finally came back after maybe half an hour or so,

10  I kept complaining, can you of loosen these cuffs up?

11  Because they cutting into my wrist.

12      Q.   Did you at any point tell either police officer

13  you were invoking your Constitutional rights or you

14  declined to give a statement?  I'm not going to talk to

15  you, anything like that?

16      A.   At the police station, after they arrested me,

17  then he wanted to ask me what happened.  I said, "Why are

18  you concerned about that after you arrest me?  You should

19  have asked me what happened before you even arrested me."

20      Q.   So, did you give him a statement at that point?

21      A.   No.

22      Q.   Okay.  So I guess --

23      A.   Not --

24      Q.   -- at no time did you tell your side of the

Courtland Pitts

51

1  story to the police?

2      A.   Wasn't given a chance till after I was

3  arrested.  Five hours, did I sit there, then when he

4  decide to arrest me, then after he arrested me then he

5  asked me what happened.  Ain't no need to be saying

6  nothing now.  Your mind is made up.

7      Q.   I'm almost done here.  You eventually -- well,

8  let me ask about preliminary hearing.  Did you have a

9  preliminary hearing or did you waive your preliminary

10  hearing?

11      A.   Yes.  We had one.

12      Q.   What happened at the preliminary hearing?  Were

13  you represented?

14      A.   Yes.  At that time, I had a public defender.

15      Q.   Do you remember who it was?

16      A.   No.  I don't remember the lady's name.

17      Q.   Who was it at trial that represented you?

18      A.   Samuel Guy.

19      Q.   Was Samuel Guy privately retained?

20      A.   Yes.

21      Q.   But you had a public defender, a woman whose

22  name you can't recall?  But you did have a preliminary

23  hearing?

24      A.   Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Courtland Pitts

53

1    Right?

2        A.    Yes.

3        Q.    You were never incarcerated as a result of

4    these charges?  In other words, they didn't raise the

5    bail?

6        A.    I don't think I was incarcerated.  Other than

7    the time when they arrested me, I was on parole, and she

8    told me, no.  I believe you, so I'm going to wait and let

9    nature take its course, run its course, before I take any

10    actions.  No, I don't think she did violate me.

11        Q.    You are talking about your parole officer?

12        A.    Yes.

13        Q.    Who was your parole officer back then?

14        A.    I can't remember who it was.  They changed them

15    over a number of years.

16        Q.    But she told you she would not violate you --

17        A.    He or she did not violate me.

18        Q.    Right.  Until the charges were resolved.  And

19    you hired Mr. Guy, went to trial, and were acquitted,

20    right?

21        A.    Yes.

22        Q.    Now, was Ms. Reid there to testify, or did she

23    testify at your trial?

24        A.    Yes, she did.

Courtland Pitts

54

1     Q.   She did?  Okay.  She just didn't remember that

2  today, but you remember her testifying?

3     A.   Yeah.  She did.

4     Q.   Okay.  And did you testify on your own behalf?

5     A.   Yes, I did.

6     Q.   Was Mr. Mitchem there?

7     A.   Yes.

8     Q.   And did he testify?

9     A.   He took the fifth.

10    Q.   Okay.  Because he still had his charges

11 pending, then, right?  Is that your understanding?

12    A.   Yes.

13    Q.   Okay.  So he declined to say anything about the

14 incident?

15    A.   The only reason why he refused to testify,

16 because his -- the guy that chased me with the bat, his

17 worker told him that he shoved me first.  So I guess he

18 didn't want to get in a conflict with --

19    Q.   But the reason he exercised his Fifth Amendment

20 rights is that he still had charges pending against him;

21 is that your understanding?  Mr. Mitchem?

22    A.   No.  He -- the reason why he didn't testify,

23 like I said, because his -- Dan Wykpisz, whatever the

24 name, already told them that he shoved me first.  So he

Courtland Pitts

55

1    didn't want to get on there and mess up the State saying

2    something different than the witness already said.

3        Q.    So Dan testified at your trial?

4        A.    Yes.

5        Q.    Okay.  And did Corporal Spence testify?

6        A.    Yes.

7        Q.    Did the female officer testify?

8        A.    No.  She didn't.

9        Q.    Okay.  And other than who we've mentioned, did

10   anybody else testify, that you can recall?

11       A.    I think for the prosecution, I think it was the

12   arresting officer, and Daniel Wykpisz, or whatever his

13   name is.

14       Q.    Right.

15       A.    And for the defense, myself and Ms. Reid, I

16   think was the only two that testified.

17       Q.    Okay.  And that was a jury trial?

18       A.    Yes.

19       Q.    And the jury found you not guilty of all the

20   charges, correct?

21       A.    After the prosecution rested its case --

22       Q.    Okay.

23       A.    -- they end up nolle prossing, or wanted to

24   dismiss one of the charges.  I told them no, the jury

Courtland Pitts

56

1    heard all of these charges together, I want the jury to

2    deliberate on them.  Once -- he nolle prossed one, the

3    Judge threw out two.  And I told the judge I am not

4    satisfied with that.  I said because you all attempting

5    to try to prejudice my case.  If the jury hear all the

6    charges, and then take a recess and some of them

7    dismissed and some of them kept, that's going further, he

8    must be guilty of some and not of the others.  So I

9    wasn't satisfied with them doing that.  I said either

10    dismiss all of them or don't dismiss nothing.  Let the

11    jury handle all of it.

12        Q.    Who was the judge?

13        A.    I don't remember who the judge was.

14        Q.    But in any event, by the end of trial --

15        A.    The jury came back, dismissed what the judge

16    didn't dismiss, and what the prosecutor did nolle prossed

17    that one.  The prosecutor nolle prossed one, the judge

18    dismissed two and the jury found me not guilty of the

19    rest of them.

20        Q.    I understand.  Did you get a letter or subpoena

21    to testify as the State's witness in the trial against

22    Mr. Mitchem?

23        A.    Yes.

24        Q.    Did you appear?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Courtland Pitts

57

1    A.    Yes, I did.

2    Q.    Did you have to testify?

3    A.    No.  They plea bargained his case.

4    Q.    So he pled guilty to -- do you know what his

5    plea was?

6    A.    No.  I do not.  I don't remember.

7    Q.    But you were present in the courthouse that

8    day, and you were ready to testify against him if they

9    needed it?

10    A.    Yes, I was.  Yes.

11    Q.    And that day, did somebody come down and tell

12    you what the --

13    A.    No.  The prosecutor told me that they was going

14    to settle this case, or plea bargain the case, and I told

15    them I wasn't satisfied with that.  I said I want the

16    guy -- whatever his name is, that chased me, I want him

17    arrested and I want this guy prosecuted.

18    Q.    So, you wanted Daniel, the guy that chased you

19    with the bat, prosecuted as well as Mr. Mitchem?

20    A.    Yes.  Yes.

21    Q.    Were you satisfied with the fact that

22    Mr. Mitchem pled guilty?

23    A.    No.  No, I wasn't satisfied.

24    Q.    You think he should have had to go to trial on